**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

_____

| | | |
|---|---|---|
| MICHAEL FORRESTER | : | |
| | : | CASE NO.: |
| | : | |
| Plaintiff, | : | v. |
| | : | |
| SOFIDEL AMERICA CORP. | : | **JURY TRIAL DEMANDED** |
| | : | |
| Defendant. | : | |

_____:

## COMPLAINT

Plaintiff, by and through his undersigned counsel, hereby avers as follows:

## INTRODUCTION

1.      This action has been initiated by Michael Forrester (hereinafter referred to as "Plaintiff") against Sofidel America Corp. (hereinafter referred to as "Defendant") for violations of the Americans with Disabilities Act ("ADA" -42 USC §§ 12101 *et. seq.*), the Family and Medical Leave Act ("FMLA" - 29 U.S.C. §§ 2601 *et seq.*), the Florida Civil Rights Act, and Florida Statutes (Fla. Stat. § 440.205 (1979)).  As a direct consequence of Defendant's unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2.      This Court, in accordance with 28 U.S.C. § 1331, has jurisdiction over Plaintiff's claims because this civil action arises under laws of the United States.

3.    This Court has supplemental jurisdiction over Plaintiff's state-law claim(s) because such claim(s) arise out of the same common nucleus of operative facts as his federal claims asserted herein.

3.    This Court may properly maintain personal jurisdiction over Defendant because Defendant's contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendant to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Co. v. Washington, 326 U.S. 310 (1945) and its progeny.

4.    Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because all of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district, and in addition, Defendant is deemed to reside where it is subject to personal jurisdiction, rendering Defendant a resident of the Middle District of Florida.

5.    Plaintiff is proceeding herein under ADA and has properly exhausted his administrative remedies with respect to such claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

## PARTIES

6.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

2

7.    Plaintiff is an adult individual who resides in Hillsborough County, Florida.

8.    Defendant is a tissue paper manufacturer headquartered in Horsham, PA with several plants throughout the United States, including the plant at which Plaintiff worked in Haines City, Polk County, Florida.

9.    At all times relevant herein, Defendant acted by and through its agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendant.

## FACTUAL BACKGROUND

10.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

11.    Plaintiff was hired by Defendant on or about April 30, 2018.

12.    For the first approximate five (5) years of Plaintiff's employment with Defendant, he was employed at Defendant's Ohio plant as the Security and Gate House Supervisor.

13.    As the Security and Gate House Supervisor, Plaintiff eventually started to perform some of the job responsibilities for which a Facility Manager would be responsible.

14.    Because of his stellar work performance, loyalty to Defendant, and his integrity, Plaintiff was promoted into the role of Facility Manager in June of 2020.

15.     Plaintiff continued to perform very well in the role of Facility Manager and was even featured in Sofidel Magazine in 2022 for his team's effort in Security and Housekeeping.

16.     In or about August of 2022, Plaintiff voluntarily transferred to Defendant's Haines City, FL plant location, where he remained employed until his unlawful termination on or about July 1, 2025.

### I.    Plaintiff Suffers a Work-Related Injury and Develops Disabilities from the Same

17.     On or about October 25, 2023, Plaintiff injured his arm while performing work for Defendant and reported said injury to Defendant's management on the same day.

18.     Plaintiff was sent for an x-ray by Defendant's workers' compensation panel physician and was told that he had tendonitis.

19.     Following his diagnosis of tendonitis, Plaintiff was scheduled for multiple physical therapy appointments with Defendant's workers' compensation panel physicians.

20.     After several months of physical therapy appointments, Plaintiff was still experiencing significant pain in his arm and as a result, was sent to occupational therapy under workers' compensation.

21.     Because Plaintiff's arm was not significantly improving, he requested a change of care in or about February of 2024.

4

22. Per his request, Plaintiff was sent to a different workers' compensation panel physician at Concentra, who notified him that he likely has nerve damage and needed to see an orthopedic doctor.

23. After visiting the orthopedic doctor, Plaintiff was diagnosed with tendonitis, arthritis, and nerve damage.

## II. Plaintiff Requests Reasonable Accommodations for His Disabilities

24. As a result of the foregoing diagnoses, Plaintiff was scheduled for two surgeries.

25. Plaintiff notified Defendant of his surgery dates on or about March 8, 2024 and was scheduled to commence a medical leave of absence for the same on or about April 29, 2024.

26. Unfortunately, Plaintiff's aforesaid surgeries were postponed multiple times, due to Defendant's workers' compensation insurance carrier, Liberty Mutual.

27. Despite his surgeries being postponed, Plaintiff started his medical leave of absence on or about April 29, 2024 and remained out of work because his conditions were getting worse and his doctor placed him under "TTD" (Temporary Total Disability).

28. Plaintiff finally underwent both aforesaid surgeries in June of 2024.

29. Plaintiff's recovery from his aforesaid surgeries was very difficult, and it was not until December of 2024 that he was released to return to work with

5

restrictions, specifically that he could not climb ladders and could not lift more than ten (10) pounds (which was later changed to 20 pounds in February of 2024).

30.     However, Defendant refused to accommodate Plaintiff's aforesaid restrictions and thus, he remained out of work for the next several months.

31.     Between October of 2023 (when Plaintiff was initially injured) and March of 2025 (when Plaintiff was released to return to work full duty – discussed further *infra*), Plaintiff had requested several accommodations due to his disabilities and restrictions, including but not limited to light duty work, intermittent and block medical leave, and an ergonomic workstation (including an ergonomic desk, keyboard and mouse).

32.     While some of the accommodations were granted (such as an ergonomic workstation), others were not (such as light duty and eventually, his block medical leave – discussed *infra*).

### III.   Plaintiff is Released to Return to Work under Full-Duty Capacity on March 24, 2025, but Defendant Blocks him from Returning for Several Months.

33.     On or about March 24, 2025, Plaintiff was officially released to return to work full duty.

34.     Plaintiff contacted Human Resources Director – Jorge Altieri (hereinafter "Altieri") to notify him of his release to return to work.

35.     During Plaintiff's discussion with Altieri, Altieri stated that upon returning to work, Plaintiff would need to meet all expectations outlined in a disciplinary report that was issued prior to his medical leave, dated April 9, 2024

(discussed further *infra*), and asked whether he thought he could meet these expectations with his disabilities.

36.     Plaintiff responded that, just like with any medical condition, he was not 100% positive that his arm would not ever give him issues again, but he was cleared to work, he could work, and he was willing to try to meet all expectations that Defendant set for him.

37.     Plaintiff also asked to speak with the Director of Environmental, Health, and Safety – Jim Ruiz (hereinafter "Ruiz") and the VP of Human Resources, Drew Sleicher ("Sleicher") about the aforesaid April 9, 2024 disciplinary report, because he had some concerns about the same.

38.     Altieri indicated that he would follow up with Ruiz and Sleicher to discuss Plaintiff's return to work and Plaintiff's aforesaid request for a meeting with both of them.

39.     As of April 1, 2025, Plaintiff had still not heard a response from Altieri.

40.     Therefore, Plaintiff reached out to Altieri again inquiring about a return-to-work date and reiterating his willingness to try to meet all expectations required of him.

41.     Plaintiff also notified Altieri that Sleicher and Ruiz never reached out to discuss his job performance or the April 9, 2024 write up.

42.     Instead of responding with a return-to-work date, Altieri replied to Plaintiff by stating that he spoke to Ruiz the day prior and that Ruiz was going to reach out to Defendants' workers' compensation insurance carrier, Liberty Mutual,

to discuss the latest update on a settlement offer that had been proposed by Liberty Mutual regarding Plaintiff's workers' compensation claim.

43.    Altieri further stated that once Ruiz had a response, he would share that updated information with leadership and get back to Plaintiff by the end of the week.

44.    Plaintiff did not receive a response by the end of that week as indicated by Altieri.

45.    Thus, Plaintiff followed up with Altieri again on April 9, 2025, inquiring whether Ruiz or Sleicher ever provided him with an update.

46.    In response to Plaintiff's April 9, 2025 inquiry, Altieri again discussed Plaintiff's workers' compensation claim and inquired whether Plaintiff's legal counsel and/or Plaintiff had had received any contact from Liberty Mutual.

47.    Plaintiff responded to Altieri's inquiry by stating that his legal counsel was waiting for medical records and that once the medical records were provided, his legal counsel would have a meeting with him and then with Liberty Mutual.

48.    Plaintiff did not receive a response from Altieri or anyone else at Defendant for several more weeks, despite his attempts to reach out on several occasions.

49.    On or about June 17, 2025, Plaintiff contacted Altieri again and explained to him that there was likely no chance of a settlement regarding his workers' compensation claim anytime soon (as Altieri had continued to ask Plaintiff about this in prior conversation, suggesting that Defendant needed an

answer regarding his workers' compensation settlement before allowing him to return to work).

50.    Plaintiff again asked Altieri for a date that he could return back to work and reiterated that he wanted to meet with HR and Safety to discuss the April 9, 2024 write up.

51.    Altieri responded by again stating that he would speak to Ruiz but stated that Sleicher had left Defendant.

52.    Following this message from Altieri, Plaintiff did not receive any follow-up communication from Altieri or Ruiz for approximately one week. Therefore, Plaintiff sent Altieri another message on June 25, 2025, asking why he was not being permitted to return to work but was still showing as an active employee in ADP.

53.    Plaintiff suggested in his communication to Altieri that he would be contacting an employment lawyer because he had no other choice due to Defendant's lack of communication and refusal to reinstate him following his release to return to work from medical leave.

54.    Plaintiff received a response from Altieri stating that he would reach out to Ruiz and that Ruiz would be in contact with Plaintiff.

55.    Ruiz never contacted Plaintiff, despite Altieri's aforesaid assurances.

**IV.    <u>After Several Months of Refusing to Allow Plaintiff to Return to Work, Defendant Unlawfully Terminated Plaintiff's Employment on July 1, 2025.</u>**

56. The next communication that Plaintiff received from Defendant was a letter on July 1, 2025 from Defendant's attorney stating that he was being terminated from his employment with Defendant.

57. Plaintiff's aforesaid termination letter suggested:

    i. Plaintiff was issued a disciplinary report in April of 2024;

    ii. Plaintiff suffered a workers' compensation injury before he was able to complete the expectations listed on the disciplinary report;

    iii. Other employees had successfully performed Plaintiff's role while he was on medical leave, which resulted in the elimination of his former position;

    iv. Plaintiff recently indicated his desire to return to work but allegedly stated that his work-related injury still prevented him from being able to fully perform the essential functions of his former position; and

    v. Plaintiff's position was being closed out as of July 1, 2025 because he had indicated a desire to be able to access his 401(k) benefits.

58. The aforesaid reasoning for Plaintiff's involuntary separation from Defendant and statements made in his termination letter are utterly pretextual and baseless for the reasons laid out in the next several paragraphs.

> a. *Defendant's representation that Plaintiff sustained a work-related injury while completing the expectations under the disciplinary report, dated April 9, 2024, is completely false.*

59.    Plaintiff did not sustain the work-related injury **_while_** completing the expectations under the disciplinary report, as suggested by Defendant's attorney in Plaintiff's termination letter.

60.    Rather, the April 2024 disciplinary report was issued to Plaintiff **_after_** he sustained a work-related injury (presumably in retaliation for filing a workers' compensation claim).

61.    Defendant's attorney tries to make it appear that Defendant disciplined Plaintiff for his alleged performance issues *prior* to his work-related injury is an obvious attempt to conceal Defendant's discriminatory/retaliatory motives.

> b. *Plaintiff was subjected to hostility and animosity following his injury, claim for workers' compensation, and requests for reasonable medical accommodations.*

62.    Following Plaintiff's work-related injury, his claim for workers' compensation, and his request for reasonable accommodations related to his disabilities (which stemmed from his work-related injury), Plaintiff was subjected to a hostile work environment, including but not limited to: (1) being treated in a rude and demeaning manner; (2) ignoring him; (3) being moved from the maintenance office to the admin building away from employees that he supervised for no logical or legitimate reason; (4) trying to blame **_only_** him for delays or failures that were either out of his control or were not his sole responsibility; (5)

11

refusing to provide him accommodations; and (6) keeping him out of work without pay for several months despite that he was released to return to work full duty.

63. The disciplinary report from April 9, 2024 was also part of the aforesaid discriminatory and retaliatory hostile work environment. In fact, this report had been issued to him only two weeks before he was scheduled to commence medical leave (as discussed *supra*) and was completely one-sided.

64. Plaintiff expressed concern about this disciplinary report in a letter to Human Resources on April 12, 2024 and reiterated that he found their timetable for improvement (*i.e.* "immediate") to be alarming, considering he was expected to commence medical leave two weeks after being issued the aforesaid disciplinary report (during which time he was also expected to train another employee).

65. Furthermore, the April 9, 2024 disciplinary report was the first write-up that Plaintiff had received during his employment with Defendant, and he was not even given ample time to improve his alleged performance issues (as he commenced medical leave shortly after it was issued).

        c. *Defendant's claim that it eliminated Plaintiff's position is a puzzling and clearly a manufactured excuse to conceal an otherwise discriminatory/retaliatory termination.*

66. Defendant states that it eliminated Plaintiff's position; however, during Plaintiff's first discussion with Altieri, he was told that ***when he returned to work***, he would need to meet all expectations outlined in the April 9, 2024 disciplinary report and asked whether he thought that was possible.

67. Therefore, despite claiming that Defendant had eliminated Plaintiff's position prior to his release to return to work, Altieri was asking questions about Plaintiff's capabilities ***for when he would return to work*** and made ***no mention*** of his position being eliminated at that point. In fact, Altieri actually indicated that Plaintiff would be returning to work and was expected to meet all expectations under the disciplinary report.

68. Further, between March of 2025 and June of 2025, Altieri and Plaintiff had several verbal conversations and exchanged numerous messages. Altieri never mentioned to Plaintiff in any of those communications that Plaintiff's position had been eliminated.

69. No one at Defendant between March of 2025 and June 30, 2025 informed Plaintiff that his position was eliminated.

> d. *Plaintiff's workers' compensation claim and potential settlement was mentioned several times by Altieri during communications about Plaintiff's return to work, indicating that they intentionally delayed his return to work in order to determine if Plaintiff would voluntarily resign as part of a workers' compensation settlement.*

70. Plaintiff was asked several times about settling his workers' compensation claim by Altieri between March of 2025 and June of 2025.

71. Any workers' compensation settlement typically includes a voluntary resignation.

72. When Plaintiff ultimately stated that his workers' compensation claim was not going to settle, he was shortly thereafter sent a termination letter.

e. *Plaintiff never stated that his work-related injury still prevented him from being able to fully perform the essential functions of his job.*

73. Defendant claims that Plaintiff ***recently*** indicated his desire to return to work but that he stated his work-related injury still prevented him from being able to fully perform the essential functions of his former position.

74. Plaintiff's desire to return to work had been expressed several times over the course of his medical leave; however, he was not released to return to work full duty until March of 2025 and had immediately requested a return-to-work date after being fully cleared (which was over three months prior to the aforesaid termination letter).

75. Plaintiff was ignored and dismissed for over three months until finally being told that he was terminated from his employment with Defendant.

76. Plaintiff also never told anyone at Defendant that his work-related injury was still preventing him from being able to fully perform the essential functions of his former position.

77. In fact, what Plaintiff told Altieri (as Altieri was the only one communicating with Plaintiff from Defendant) was that just like with any medical condition, he was not 100% positive that his arm would never give him issues again, but he was cleared to work, he could work, and he was willing to try to meet all expectations that Defendant set for him upon his return to work.

14

78.   The fact that Defendant is attempting to make it appear that Plaintiff stated his medical condition was still preventing him from performing his job is absurd and completely false.

   f.   *Plaintiff was terminated after threatening to seek legal counsel because of Defendant's ongoing unlawful actions of keeping him out of work without pay.*

79.   On June 25, 2025, Plaintiff sent a message to Altieri indicating that he was going to seek legal counsel because Defendant had backed him into a corner (by refusing to allow him to return to work and consistently ignoring his requests for a return-to-work date).

80.   It was only after sending this message that Defendant finally responded to Plaintiff's request for reinstatement by sending him a termination letter on July 1, 2025.

   g.   *Defendant's claim that it only closed out Plaintiff's position because Plaintiff requested access to his 401(k) is simply an attempt to cover up Defendant's discriminatory/retaliatory motive and place the onus on Plaintiff for his own termination.*

81.   Defendant stated that Plaintiff's position was being "closed out" as of July 1, 2025 because he had indicated a desire to be able to access his 401(k) benefits; however, this statement was taken out of context in an effort to make it appear as if Plaintiff wanted Defendant to terminate his employment.

82.   In reality, Plaintiff's reference to his 401(k) was made during a message to Altieri where he expressed concern about being in limbo for the last 3+ months and stated that because he was still an active employee, despite

15

Defendant's refusal to let him return to work, he could not move or pull out his 401(k), and he was not receiving any benefits or pay since March of 2025.

83.    Defendant's effort to twist the facts surrounding Plaintiff's unlawful termination is a baseless attempt to avoid lability in this matter, where the circumstances clearly show that Plaintiff was kept out of work for over three months without pay despite being cleared to return without restrictions, not reinstated to the same or similar position after being fully cleared to return to work, and eventually terminated in violation of state and federal law.

## First Cause of Action
## Violations of the Americans with Disabilities Act, as amended
## ("ADA")
**([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation;
[3] Hostile Work Environment; & [4] Failure to Accommodate)**

84.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

85.    Plaintiff suffers from qualifying health conditions under the ADA (as amended), which (at times) affects his ability to perform some daily life activities.

86.    Plaintiff was subjected to hostile work environment due to his (1) his known and/or perceived disabilities; (2) his record of impairment; and/or (3) because he engaged in protected activity under the ADA.

87.    Between October of 2023 and March of 2025, Plaintiff had requested several accommodations due to his disabilities and restrictions, including but not limited to light duty work, intermittent and block medical leave, and an ergonomic workstation (including an ergonomic desk, keyboard and mouse).

16

88.    While some of the aforesaid accommodations were granted, others were not.

89.    For example, when Plaintiff tried to return from a medical leave of absence in December of 2024, he requested light duty work but was denied and remained out of work for the next several months.

90.    When Plaintiff was finally released to return to work full duty, Defendant refused to give him a start date, kept him out of work without pay for several months, and then terminated his employment on July 1, 2025, pretextually claiming that they had eliminated his position.

91.    Plaintiff's (1) known disabilities; (2) perceived disabilities; or (2) his record of impairment was a motivating or determinative factor in Defendant's decision to keep Plaintiff out of work without pay for over three months and then terminate his employment on July 1, 2025.

92.    Plaintiff also believes and avers that he was kept out of work for over three months and then terminated on July 1, 2025, because he engaged in protected activity under the ADA.

93.    Defendant also failed to accommodate Plaintiff's aforesaid disabilities, by refusing him light duty work and by refusing to reinstate him upon his return from medical leave.

94.    These actions as aforesaid constitute violations of the ADA, as amended.

**Second Cause of Action**

17

## Florida Civil Rights Act ("FCRA")
### ([1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation; [3] Hostile Work Environment; & [4] Failure to Accommodate)

95.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

96.    Plaintiff suffers from qualifying health conditions under the FCRA, which (at times) affects his ability to perform some daily life activities.

97.    Plaintiff was subjected to hostile work environment due to his (1) his known and/or perceived disabilities; (2) his record of impairment; and/or (3) because he engaged in protected activity under the FCRA.

98.    Between October of 2023 and March of 2025, Plaintiff had requested several accommodations due to his disabilities and restrictions, including but not limited to light duty work, intermittent and block medical leave, and an ergonomic workstation (including an ergonomic desk, keyboard and mouse).

99.    While some of the aforesaid accommodations were granted, others were not.

100.    For example, when Plaintiff tried to return from a medical leave of absence in December of 2024, he requested light duty work but was denied and remained out of work for the next several months.

101.    When Plaintiff was finally released to return to work full duty, Defendant refused to give him a start date, kept him out of work without pay for several months, and then terminated his employment on July 1, 2025, pretextually claiming that they had eliminated his position.

18

102.    Plaintiff's (1) known disabilities; (2) perceived disabilities; or (2) his record of impairment was a motivating or determinative factor in Defendant's decision to keep Plaintiff out of work without pay for over three months and then terminate his employment on July 1, 2025.

103.    Plaintiff also believes and avers that he was kept out of work for over three months and then terminated on July 1, 2025, because he engaged in protected activity under the ADA.

104.    Defendant also failed to accommodate Plaintiff's aforesaid disabilities, by refusing him light duty work and by refusing to reinstate him upon his return from medical leave.

105.    These actions as aforesaid constitute violations of the FCRA.

### Third Cause of Action
### Violations of the Family and Medical Leave Act ("FMLA")
### (Retaliation & Interference)

106.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

107.    Plaintiff was an eligible employee under the definitional terms of the FMLA, 29 U.S.C. § 2611(a)(i)(ii).

108.    Plaintiff requested leave from Defendant, his employer, with whom he had been employed for at least twelve months prior to his request for FMLA, pursuant to the requirements of 29 U.S.C.A § 2611(2)(i).

109.    Plaintiff had at least 1,250 hours of service with Defendant during his last full year of employment (preceding his request for medical leave).

19

110.    Defendant is engaged in an industry affecting commerce and employs fifty (50) or more employees for each working day during each of the twenty (20) or more calendar work weeks in the current or proceeding calendar year, pursuant to 29 U.S.C.A § 2611(4)(A)(i).

111.    Plaintiff was entitled to receive leave pursuant to 29 U.S.C.A § 2612 (a)(1) for a total of twelve (12) work weeks of leave on a block or intermittent basis.

112.    Defendant committed interference and retaliation violations of the FMLA by: terminating Plaintiff for requesting and/or exercising his FMLA rights and/or for taking actions towards Plaintiff that would intimidate a regular person in his position from exercising his rights under the FMLA (such as issuing him a pretextual disciplinary notice approximately two weeks before he was scheduled to commence FMLA leave).

113.    These actions as aforesaid constitute violations of the FMLA.

**Fourth Cause of Action**
**Violation of Fla. Stat. § 440.205 (1979)**
**(Retaliation)**

114.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

115.    Upon information and belief, Plaintiff was terminated in substantial pursuing a workers' compensation claim.

116.    "[S]ection 440.205, Florida Statutes (1979), creates a statutory cause of action for a wrongful discharge in retaliation for an employee's pursuit of a workers' compensation claim and such action is not cognizable before a deputy

commissioner [at a worker's compensation hearing] but rather is cognizable in a court of competent jurisdiction." *Smith v. Piezo Tech. & Prof'l Adm'rs*, 427 So. 2d 182, 183-84 (Fla. 1983); *see also Bifulco v. Patient Bus. & Fin. Servs.*, 39 So. 3d 1255, 1257 (Fla. 2010) ("Section 440.205 of the Workers' Compensation Law creates a cause of action for employees who are subject to retaliatory treatment by their employers for attempting to claim workers' compensation.").

117.    These actions as aforesaid constitute wrongful termination in the state of Florida.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.    Defendant is to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendant's illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority;

B.    Plaintiff is to be awarded punitive and/or liquidated damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendant for its willful, deliberate, malicious and outrageous conduct and to deter Defendant or other employers from engaging in such misconduct in the future;

C.    Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress / pain and suffering); and

D.      Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law.

Dated this 30th day of March 2026.

Respectfully submitted,

*/s/ Steven G. Wenzel*
**STEVEN G. WENZEL**
Florida Bar No.159055
**Wenzel Fenton Cabassa, P.A.**
1110 N. Florida Avenue, Suite 300
Tampa, Florida 33602
Main No.: 813-224-0431
Direct No.: (813) 223-6545
Facsimile No.: 813-229-8712
Email: swenzel@wfclaw.com
Email: rcooke@wfclaw.com
***Attorneys for Plaintiff***

*/s/ Allison A. Barker*
**ALLISON A. BARKER**
Pennsylvania Bar No. 326837
**Karpf, Karpf & Cerutti, P.C.**
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
Tel: (215) 639-0801
Fax: (215) 639-4970 fax
Email: abarker@karpf-law.com
***Attorneys for Plaintiff***

***[To be admitted Pro Hac Vice]***